**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Steven Michael ADAMS, Defendant–
Appellant.**

**No. 02–50196.**

United States Court of Appeals,
Ninth Circuit.

Submitted Sept. 3, 2003.*

Filed Sept. 10, 2003.

---

\* The panel unanimously finds this case suitable for decision without oral argument. See Fed. R.App. P. 34(a)(2).

Kevin M. Bringuel, Federal Defenders of San Diego, San Diego, California, for the defendant-appellant.

Anne Kristina Perry, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before LAY,** HAWKINS, and TALLMAN, Circuit Judges.

** Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit,

## OPINION

TALLMAN, Circuit Judge.

In *United States v. McCoy*, 323 F.3d 1114 (9th Cir.2003), we entertained an "as applied" constitutional challenge to 18 U.S.C. § 2252(a)(4)(B) and held that Congress lacks the power under the Commerce Clause to criminalize the "simple intrastate possession of home-grown child pornography not intended for distribution or exchange." 323 F.3d at 1122–23. Now we must answer the question left undecided in *McCoy:* whether 18 U.S.C. § 2252(a)(4)(B), on its face, is an unconstitutional exercise of congressional power. We hold that it is not.

We also hold that the definition of "sexually explicit conduct" found at 18 U.S.C. § 2256(2)(A), on its face, is not substantially overbroad under the First Amendment. Nor is the statute void for vagueness. We affirm the conviction that underlies these challenges.

I

In October 1999, San Diego County sheriffs deputies searched the home of Defendant–Appellant Steven Adams after receiving a report that Adams had been fraternizing with children. At the time, Adams was a sex-offender on state probation and was required to submit to such searches. In the course of the search, deputies seized a billyclub, pornographic pictures of adults, non-pornographic pictures of Adams with children, Adams's computer, and several computer diskettes.

Forensic analysis of Adams's computer and diskettes revealed previously deleted images of naked, prepubescent children engaged in various sexual acts. In June 2001, approximately nineteen months after

sitting by designation.

the search of his home and the seizure of the computer and computer diskettes, a federal grand jury indicted Adams for receiving and possessing child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B). The indictment specifically referenced the computer and diskettes seized by the State of California.

The federal charges against Adams stemmed from an investigation into the activities of Janice and Thomas Reedy. The Reedys operated a pornographic Internet website in Texas known as Landslide. Landslide provided subscribing members access to child pornography websites. Adams subscribed to Landslide and admits that he viewed and possessed "prohibited images" downloaded from the Internet.

The district court denied Adams's motion in limine to dismiss the indictment. Adams then conditionally pled guilty to one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), and reserved his right to challenge the constitutionality of the statute.[1] *See* Fed. R.Crim. Pro. 11(a)(2). As part of a plea agreement, Adams admitted the following facts:

1. On October 22, 1999, a search was conducted at the home of defendant STEVEN ADAMS. At the time of the search, ADAMS was in possession of a computer and a number of computer diskettes.

2. The computer diskettes and computer contained components that were not manufactured in the State of California.

3. The computer diskettes and computer contained visual depictions of minors engaged in sexually explicit conduct.

4. The production of the visual depictions involved the use of minors engaging in sexually explicit conduct.

5. The images include depictions of actual children.

■ Adams now appeals. We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's denial of Adams's motion to dismiss the indictment and its determination of the constitutionality of the statute. *United States v. Cortes,* 299 F.3d 1030, 1032 (9th Cir.2002).

## II

### A

Adams first argues that Congress is powerless to enact a statute criminalizing intrastate possession of child pornography. To decide whether 18 U.S.C. § 2252(a)(4)(B) is a valid exercise of congressional power under the Commerce Clause, we examine the recent Supreme Court decisions of *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), which set forth the relevant analytical framework.

■ [1] *Lopez* "identified three broad categories of activity that Congress may regulate under its commerce power": (1) the channels of interstate commerce, (2) the instrumentalities of interstate com-

---

1. We reject the argument that Adams's indictment was constitutionally infirm because of an improper instruction when the grand jury was empaneled. The instruction given by the district court mirrored the model charge recommended by the Administrative Office of the United States Courts. In *United States v.*

*Marcucci,* 299 F.3d 1156 (9th Cir.2002), we ruled that the model charge did not misstate the constitutional role and function of the grand jury. *Marcucci* controls here. We must decline Adams's invitation to overrule that decision. *See Hart v. Massanari,* 266 F.3d 1155, 1171 (9th Cir.2001).

merce, and (3) "those activities that substantially affect interstate commerce." 514 U.S. at 558–59, 115 S.Ct. 1624. Of course, the possession of child pornography concerns neither the channels nor the instrumentalities of interstate commerce. It follows that the possession of child pornography must "substantially affect interstate commerce" in order for Congress to regulate it under the Commerce Clause.

 In *Morrison*, the Court "established what is now the controlling four-factor test for determining whether a regulated activity 'substantially affects' interstate commerce." *McCoy*, 323 F.3d at 1119. These considerations are: (1) whether the regulated activity is commercial/economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated. *Morrison*, 529 U.S. at 610–12, 120 S.Ct. 1740. The "most important" factors for a court to consider are the first and the fourth. *McCoy*, 323 F.3d at 1119. "An activity that is utterly lacking in commercial or economic character would likely have too attenuated a relationship to interstate commerce and would, accordingly, not be subject to regulation under the Commerce Clause." *Id.* In contrast, activities that do have an economic or commercial character will likely have a nexus to interstate commerce and, accordingly, would be proper objects of congressional regulation under the Commerce Clause.

### B

In *McCoy*, we considered whether the federal government may criminalize the intrastate possession of child pornography. *Id.* at 1115. But the *McCoy* panel declined to address whether the statute criminaliz-

ing mere possession is unconstitutional on its face—the issue in this appeal. Instead it only held that, as applied to Rhonda McCoy, 18 U.S.C. § 2252(a)(4)(B) was an unconstitutional exercise of congressional power. We recount the facts and reasoning of *McCoy* in some detail.

Jonathan McCoy decided to take a photograph of his intoxicated wife, Rhonda, and their ten-year-old daughter. Rhonda and her daughter posed for the picture, standing side by side, partially unclothed with their genitals exposed. A photo processor saw the picture and reported the McCoys to the authorities. *Id.* at 1115.

Rhonda and Jonathan were charged with manufacturing and transporting child pornography. *Id.* at 1116. Jonathan elected to stand trial and was acquitted. *Id.* Rhonda entered into plea negotiations with the government and conditionally pled guilty to possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), preserving for appeal whether "[the statute], on its face and as applied, constitutes an unconstitutional exercise of Congress's Commerce Clause power." *Id.* at 1116–17.

The panel considered only Rhonda McCoy's "as applied" challenge to the statute: "whether a statute enacted pursuant to the Commerce Clause may constitutionally reach non-commercial, non-economic individual conduct that is purely intrastate in nature, when there is no reasonable basis for concluding that the conduct had or was intended to have any significant interstate connection or any substantive effect on interstate commerce." *Id.* at 1117. The court then applied the *Morrison* "four-part mode of inquiry." *Id.* at 1117–29.

Applying the first *Morrison* factor—whether the regulated activity is commercial or economic in nature—*McCoy* concluded "that simple intrastate possession

of home-grown child pornography not intended for distribution or exchange is 'not, in any sense of the phrase, economic activity.' " *Id.* at 1122–23 (quoting *Morrison,* 529 U.S. at 613, 120 S.Ct. 1740). The court determined that home-grown child pornography intended for personal use did not influence, in any way, the national market for child pornography.

The court expressly noted its disagreement with the Third Circuit's decision in *United States v. Rodia,* 194 F.3d 465 (3d Cir.1999). *Rodia* posited that "the possession of 'home grown' pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography." *Id.* at 477. This "addiction" theory, *McCoy* reasoned, rested on "highly questionable premises" for several reasons. *McCoy,* 323 F.3d at 1121. First, *Rodia's* "common sense understanding of the demand side forces" was based on speculation and not explicit congressional findings. *Id.* Second, *Rodia's* "labeling of persons who possess a 'home-grown' picture of a child as 'child pornographers' and addicts-in-futuro" was highly debatable in that it piled "presumption on presumption." *Id.* at 1122. Finally, *Rodia's* conclusion that home-grown pornography is a fungible good was incorrect because home-grown pornography often is intended for personal use and not for exchange, as was the case with Rhonda McCoy's photograph. *Id.*

*McCoy* explained that the *Wickard v. Filburn* "aggregation principle" did not apply to render McCoy's activity economic in nature. *Id.* at 1120–23; *see also Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). In *Wickard,* the

Supreme Court held that Congress did not exceed its Commerce Clause power in restricting the bushels of wheat a farmer could grow for personal use.[2]

*McCoy* reasoned that unlike Filburn's home-grown wheat, McCoy's home-grown photograph

> had no connection with or effect on any national or international commercial child pornography market, substantial or otherwise. The picture of McCoy and her daughter which McCoy possessed for her own personal use did not "compete" with other depictions exchanged, bought, or sold in the illicit market for child pornography and did not affect their availability or price. Nor are pictures of the type McCoy possessed connected in any respect with commercial or economic enterprises.

*McCoy,* 323 F.3d at 1122. In other words, "Filburn's home-grown wheat may not have been meant for sale, but its very existence had an economic effect.... McCoy's photo does not have any plausible economic impact on the child pornography industry." *Id.* at 1120 n. 11.

Applying the fourth *Morrison* factor, attenuation, *McCoy* explained that the link between the possession of home-grown child pornography and interstate commerce was too remote to support the exercise of congressional power under the Commerce Clause. In fact, the court held that there was no relationship whatsoever between McCoy's possession of her personal photograph and the interstate market for child pornography. *Id.* at 1123–24.

> The Court stated: "if we assume that [the wheat] is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce." 317 U.S. at 128, 63 S.Ct. 82.

---

**2.** *Wickard* reasoned that, in the aggregate, home-grown wheat reduced the overall demand for the grain, which in turn reduced the price. Home-grown wheat thus affected the interstate market for the good and was an appropriate subject of congressional regulation. *Wickard,* 317 U.S. at 128, 63 S.Ct. 82.

*McCoy* then addressed the second *Morrison* factor—whether an express jurisdictional element is provided in the statute to limit its reach. Here it noted that " § 2252(a)(4)(B) contains an express jurisdictional element that is intended to satisfy Commerce Clause concerns." *Id.* This "jurisdictional hook" limits prosecutions under § 2252(a)(4)(B) to instances where the pornographic matter has been mailed, transported, or shipped in interstate commerce *or* where the matter "was produced using materials which have been mailed or so shipped or transported." 18 U.S.C. § 2252(a)(4)(B). Because "all but the most self-sufficient child pornographers will rely on film, cameras, or chemicals that traveled in interstate commerce," *McCoy*, 323 F.3d at 1125 (quoting *Rodia*, 194 F.3d at 473), *McCoy* concluded that the "jurisdictional hook" of § 2252(a)(4)(B) is "useless" and that it "provides no support for the government's assertion of federal jurisdiction." *Id.* at 1126; *see also United States v. Angle*, 234 F.3d 326, 337 (7th Cir.2000).

Finally, applying the third *Morrison* factor—whether Congress made express findings about the effects of the possession of child pornography on interstate commerce—*McCoy* held that "the findings in the statute and the legislative history do not support the conclusion that purely intrastate 'home-grown' possession has a substantial connection to interstate trafficking in commercial child pornography." *McCoy*, 323 F.3d at 1130. The court noted that the legislative history "speak[s] only to the general phenomenon of commercial child pornography; [it does] not speak to the relationship between intrastate noncommercial conduct like McCoy's and the

interstate commercial child pornography market." *Id.* at 1127. "At most," *McCoy* held, "the legislative history here tells us that Congress intended to eliminate the interstate commercial child pornography market, and nothing more." *Id.*

 *McCoy* thus concluded that simple intrastate possession of home-grown child pornography did not substantially affect interstate commerce and therefore 18 U.S.C. § 2252(a)(4)(B) was unconstitutional as applied to McCoy. *Id.* at 1132. Expressly left unanswered in *McCoy* was whether the statute is facially constitutional. *Id.* We answer that question today.

## C

Unlike Rhonda McCoy, Adams does not challenge the constitutionality of 18 U.S.C. § 2252(a)(4)(B) "as applied" to his conduct. Nor could he. Adams was prosecuted for possessing commercial, not home-grown, child pornography.[3] If constitutional at all, 18 U.S.C. § 2252(a)(4)(B) must reach the possession of commercial child pornography.

The *Morrison* four-part mode of inquiry must guide our analysis. *McCoy*, 323 F.3d at 1119. There is no effective limit on federal jurisdiction under the express terms of the statute. *Id.* at 1124 (noting that the "jurisdictional hook" in § 2252(a)(4)(B) "not only fails to limit the reach of the statute to any category or categories of cases that have a particular effect on interstate commerce, but, to the contrary, it encompasses virtually every case imaginable, so long as any modern-day photographic equipment or material has been used"). So we focus here on the

---

**3.** By "commercial child pornography," we mean any sexually explicit depiction of a minor produced for sale, trade, or dissemination to the public. Adams admitted to possessing "prohibited images . . . downloaded from a web site." (Def.'s Mot. for Downward Adjustments and Departures, No. 01 CR 1804, at 6

(S.D.Cal., March 12, 2002).) *See United States v. Bentson*, 947 F.2d 1353, 1356 (9th Cir.1991) ("A judicial admission is binding before both the trial and appellate courts."). He therefore concedes that he possessed commercial child pornography.

remaining three *Morrison* factors: (1) whether the mere possession of commercial child pornography may be considered commercial/economic in nature; (2) whether the link between such possession and the effect on interstate commerce is too attenuated to support the congressional exercise of power; and (3) whether Congress made express findings about the effects of possession of child pornography on interstate commerce.

We begin with the legislative history of 18 U.S.C. § 2252, for the approach taken by Congress in regulating child pornography is instructive in discerning how the possession of child pornography has a nexus to economic activity.[4] The first incarnation of 18 U.S.C. § 2252 came with passage of the Protection of Children Against Sexual Exploitation Act in 1978. This legislation criminalized both the sale and distribution for sale of child pornography. Pub.L. No. 95–225, § 2(a), 92 Stat. 7, 7–8 (1978). Congress concluded such legislation was necessary because "child pornography and child prostitution [had] become highly organized, multimillion dollar indus-

tries that operate[d] on a nationwide scale." S. Rep. 95–438 at 5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 42.

Various amendments to § 2252 followed.[5] These amendments responded to a growing—and increasingly underground—child pornography industry.[6]

The Child Protection Restoration and Penalties Act of 1990 first criminalized the mere possession of child pornography.[7] Pub.L. No. 101–647, Title III, § 323, 104 Stat. 4789 (1990). Senator Strom Thurmond introduced the legislation. According to Senator Thurmond, greater federal involvement and more stringent laws, including laws criminalizing the possession of child pornography, were needed to destroy the market for child pornography:

> We must continue to strengthen our Nation's criminal laws in order to stamp out this vice at all levels in the distribution chain. Since the child pornography market has, in large part, been driven underground, we cannot solve the problem by only attacking the production or distribution of child pornography.

---

**4.** For a more detailed overview of the legislative history of 18 U.S.C. § 2252, see Dean C. Seman, "United States v. Corp: *Where to Draw the Interstate Line on Congress' Commerce Clause Authority to Regulate Intrastate Possession of Child Pornography*," 9 Vill. Sports & Ent. L.J. 181, 184 86 (2002), and Bradley Scott Shannon, "*The Jurisdictional Lim its of Federal Criminal Child Pornography Law*," 21 U. Haw. L.Rev. 73, 79–87 (1999).

**5.** The Child Protection Act of 1984 amended § 2252 and greatly expanded the reach of federal prosecution. Among other things, the Child Protection Act excised the commercial purpose requirement of the old statute, criminalized the reproduction of child pornography, and eliminated the requirement that the depiction be obscene to be subject to federal law. Pub.L. No. 98–292, § 4, 98 Stat. 204, 204–05 (1984). A House of Representatives report justified these amendments by noting: "The creation and proliferation of child pornography is no less than a national tragedy.

Each year tens of thousands of children under the age of 18 are believed to be filmed or photographed while engaging in sexually explicit acts for the producer's own pleasure or profit." H.R. Rep. 98–536 at 1 (1983), *reprinted in* 1984 U.S.C.C.A.N. 492.

A 1986 amendment added longer prison sentences for repeat offenders. Pub.L. No. 99–591, § 702, 100 Stat. 3341 (1986). A 1988 amendment criminalized the transmission of child pornography "by any means including by computer:" Pub.L. No. 100–690, § 7511(b), 102 Stat. 4485 (1988).

**6.** "[E]xperience revealed that much if not most child pornography mate rial is distributed through an underground network of pedophiles who exchange the material on a noncommercial basis, and thus no sale is involved." H.R. Rep. 99–910 at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5952.

**7.** This legislation was part of the Crime Control Act of 1990.

This bill meets this challenge by expanding the scope of prohibited activities relating to child pornography. Under current law, it is a crime to knowingly transport, distribute, receive or reproduce any child pornography which has traveled in interstate or foreign commerce. Unfortunately, those who simply possess or view this material are not covered by current law. This bill addresses this insufficiency because *those who possess and view child pornography encourage its continual production and distribution.*

136 Cong. Rec. S4728, S4729–30 (April 20, 1990) (statement of Sen. Thurmond) (emphasis added). Subsequent legislative history confirms that the views of Senator Thurmond were shared by Congress as a whole. For example, a 1996 Senate report explains that "prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to *eliminate the market for the sexual exploitative use of children.*" S. Rep. 104–358 at 3 (1996), 1996 WL 506545 (emphasis added); *see also* id. at 26 (statement of Sen. Grassley).[8]

This legislative history leads us to three observations: (1) Congress determined that child pornography is a multi-million dollar industry in which sexually explicit depictions of children are bought, sold, and traded interstate; (2) Congress decided to "stamp out" the market for child pornography by criminalizing the production, distribution, receipt, *and possession* of child pornography; and (3) Congress thought it could strike a blow to the industry by proscribing possession of child pornography "because those who possess and view child pornography encourage its continual production and distribution." 136 Cong. Rec. at S4730.

■ Congress criminalized possession of child pornography as "part of a larger regulation of economic activity." *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624. We therefore conclude that the possession of commercial child pornography has at least some nexus to economic activity[9]; we explain in more detail below precisely why this is so. For now we note that the first *Morrison* factor, whether the activity regulated is economic or commercial in nature, and the third *Morrison* factor, legislative history, support the exercise of congressional power.

We reject Adams's proposition that "simple . . . possession of photographs or film is as non-commercial as the simple possession of a firearm in a school zone." In *Lopez,* the Supreme Court struck down the Gun Free School Zones Act in part because the possession of a gun in a school zone "has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."

---

8. We are mindful that subsequent legislative history is a "hazardous basis for inferring the intent of an earlier Congress." *McCoy,* 323 F.3d at 1121 (quoting *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990)). We choose to note the 1996 Senate report nonetheless because it supplements those views articulated by Senator Thurmond. *See Rodia,* 194 F.3d at 478 n. 6 ("Where . . . Congress's subsequent factfinding supplements, rather than conflicts with, its earlier statements . . . we think that subsequent fact-finding can be considered, though not given a large role, in the rational basis determination.").

9. *McCoy* does not preclude this conclusion. Though in *McCoy* the panel reasoned that possession of home-grown pornography "is 'not, in any sense of the phrase, economic activity,'" 323 F.3d at 1122–23 (quoting *Morrison,* 529 U.S. at 613, 120 S.Ct. 1740), the panel was quick to point out that its analysis did not extend "to wholly intrastate possession of a commercial or economic character." 323 F.3d at 1132.

514 U.S. at 561, 115 S.Ct. 1624. But the Court was quick to note that the statutory provision at issue was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* In contrast to *Lopez,* here the statute criminalizing possession *is* part of the larger congressional scheme to eradicate the market for child pornography. *Lopez* does not stand for the proposition that Congress is powerless in all situations to criminalize the intrastate possession of a contraband good, particularly where the congressional intent is to stamp out the entire market for that good.[10]

Having determined that the possession of commercial child pornography has some nexus to the child pornography market, and therefore economic activity, the question remains whether criminalizing the possession of commercial child pornography is so attenuated from interstate commerce that we must conclude Congress exceeded its Commerce Clause powers in enacting § 2252(a)(4)(B). We hold that the link between possession of commercial child pornography and the interstate market for commercial child pornography is sufficiently close to support the congressional exercise of power.

Laws criminalizing the possession of a good decrease the demand for that good. This decreased demand results in a decrease of supply as production becomes less profitable and therefore less attractive. Commercial child pornography is such a good susceptible to market forces, as the Supreme Court recognized in *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). There the Court upheld against a First Amendment challenge Ohio's proscription of the mere possession of child pornography. 495 U.S. at 111, 110 S.Ct. 1691. Ohio wanted "to destroy[the] market for the exploitative use of children," *id.* at 109, 110 S.Ct. 1691, and the Court acknowledged that Ohio's law advanced this goal. "It is ... surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand." *Id.* at 109–110, 110 S.Ct. 1691. Because "much of the child pornography market has been driven underground ... it is now difficult, if not impossible, to solve the child pornography problem by only attacking production and distribution." *Id.* at 110, 110 S.Ct. 1691. Ohio could reasonably criminalize the possession of child pornography "to stamp out this vice at all levels in the distribution chain." *Id.* Here, Congress likewise sought to "stamp out" the interstate market for commercial child pornography by criminalizing intrastate possession of the good.

▪ Considering *Morrison* and viewing the effects of possession of commercial child pornography in the aggregate, *see Wickard,* 317 U.S. at 128, 63 S.Ct. 82,[11] we

---

**10.** We think there is little doubt that if Congress had intended to eliminate the interstate market for guns (assuming, arguendo, that such a law would be constitutional), Congress could proscribe the intrastate possession of firearms. But the intent behind the Gun Free School Zones Act was to protect school children from gun violence—not to regulate a national market in firearms.

**11.** The Supreme Court recently reaffirmed the *Wickard* aggregation principle in *The Citizens*

*Bank v. Alafabco, Inc.,* —— U.S. ——, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003). "Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice ... subject to federal control.' " —— U.S. at ——, 123 S.Ct. at 2040 (quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)).

think the possession of commercial child pornography substantially affects the national market for child pornography. Any possession of commercial child pornography, whether the possession resulted from inter— or intrastate sale, trade, or dissemination, can produce this effect. We therefore hold that Congress did not exceed its Commerce Clause power in enacting 18 U.S.C. § 2252(a)(4)(B).[12]

### III

Adams asks us to invalidate 18 U.S.C. § 2256(2)(A), which defines "sexually explicit conduct." He contends the statute is facially overbroad and void for vagueness. We address each of these claims in turn.

### A

■■■ The overbreadth doctrine prohibits the government from proscribing a "substantial" amount of constitutionally protected speech. *See Virginia v. Hicks,* —— U.S. ——, ——, 123 S.Ct. 2191, 2196, 156 L.Ed.2d 148 (2003). An overbroad law "suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.' " *Id.* (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). A statute is not invalid simply because some impermissible applications are conceivable. *New York v. Ferber,* 458 U.S. 747, 772, 102 S.Ct. 3348,

73 L.Ed.2d 1113 (1982). Instead, the "law's application to protected speech [must] be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." *Hicks,* —— U.S. at ——, 123 S.Ct. at 2197.

Adams pled guilty to 18 U.S.C. § 2252(a)(4)(B), which criminalizes the possession of any "matter which contain[s] any visual depiction" where "the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct."[13] 18 U.S.C. § 2252(a)(4)(B)(i). "Sexually explicit conduct" is defined at 18 U.S.C. § 2256(2)(A) as

actual or simulated—

> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
>
> (ii) bestiality;
>
> (iii) masturbation;
>
> (iv) sadistic or masochistic abuse; or
>
> (v) lascivious exhibition of the genitals or pubic area of any person.

■■■ It is this definition to which Adams objects.[14] According to Adams, the statute proscribes a substantial amount of protected speech because it reaches "simulated" sexual conduct and the "lascivious exhibition of the genitals or pubic area."

We hold that the Supreme Court's decision in *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113, forecloses Adams's argument that 18 U.S.C.

---

**12.** Other circuits are generally in accord. *See United States v. Hampton,* 260 F.3d 832 (8th Cir.2001); *United States v. Corp,* 236 F.3d 325 (6th Cir.2001); *United States v. Kallestad,* 236 F.3d 225 (5th Cir.2000); *United States v. Angle,* 234 F.3d 326 (7th Cir.2000); *United States v. Rodia,* 194 F.3d 465 (3d Cir.1999); *United States v. Robinson,* 137 F.3d 652 (1st Cir.1998); *see also United States v. Buculei,* 262 F.3d 322 (4th Cir.2001) (recognizing the constitutionality of § 2252(a)); *United States v. Galo,* 239 F.3d 572 (3d Cir.2001) (reaffirming *Rodia* ); *United States v. Bausch,* 140 F.3d

739 (8th Cir.1998). *But see Kallestad,* 236 F.3d at 231 (Jolly, J., dissenting).

**13.** Because Adams entered his guilty plea only to this subsection, he does not have standing to challenge the constitutionality of other subsections.

**14.** Adams has standing to bring an overbreadth challenge. *See, e.g., Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).

§ 2256(2)(A) is substantially overbroad. *Ferber* considered an overbreadth challenge to a New York statute criminalizing child pornography. The New York statute defined "sexual conduct" as "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals." *Ferber*, 458 U.S. at 751, 102 S.Ct. 3348. The Court reasoned that although the statute may reach some protected expression, such as medical textbooks and pictorials in artistic or educational contexts, it "seriously doubt[ed] ... that these arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach." *Id.* at 773, 102 S.Ct. 3348.

We hold that the statute at issue in *Ferber* is legally indistinguishable from 18 U.S.C. § 2256(2)(A). True, the New York statute criminalized the "lewd exhibition of the genitals" whereas the present statute criminalizes the "lascivious exhibition of the genitals." But this court has equated "lascivious" with "lewd." *United States v. Wiegand*, 812 F.2d 1239, 1243 (9th Cir. 1987), *cert. denied*, 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987). The statute is not substantially overbroad.

**B**

"A statute is void for vagueness if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1345 (9th Cir.1984) (citations omitted); *see also Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Adams does not contend that 18 U.S.C. § 2256(2)(A) is vague as applied to his conduct—he concedes that the statute put him on notice that it was illegal to possess the sexually explicit depictions for which he pled guilty. Instead, he argues that the statute must be struck down as facially vague.

Essentially, Adams contends that the definition of "sexually explicit conduct" includes ambiguous terms that, individually or collectively, are not susceptible to a common understanding. In particular, Adams objects to the terms "simulated" and "lascivious," which he asserts are too subjective to put an ordinary person on notice as to what material is criminalized by the statute. Even if Adams has prudential standing to raise this facial vagueness claim,[15] an issue we do not decide, his

---

**15.** In *Schwartzmiller v. Gardner*, we explained that when "no constitutional overbreadth problem exists ... a party has standing to challenge a statute facially, despite the ordinary rule against facial statutory review, if no standard of conduct is specified at all; that is, if the statute is impermissibly vague in all of its applications." 752 F.2d at 1347 (internal quotation marks and citations omitted). According to the *Schwartzmiller* court, this standing rule applies even where the First Amendment is implicated. To the extent a vague statute infringes upon First Amendment freedoms, "facial vagueness analysis becomes the functional equivalent of facial overbreadth analysis and, apparently, adds nothing new to statutory facial consideration." *Id.* Adams essentially concedes that the present statute is not "impermissibly

vague in all of its applications." Thus under *Schwartzmiller*, Adams lacks standing to argue facial vagueness.

Subsequent Ninth Circuit authority conflicts with the *Schwartzmiller* rule. For example, in *California Teachers Association*, we noted that "[i]n the First Amendment context, facial vagueness challenges are appropriate if the statute clearly implicates free speech rights." *Cal. Teachers Ass'n v.State Bd. of Educ.*, 271 F.3d 1141, 1149 (9th Cir.2001) (citing *Foti v. City of Menlo Park*, 146 F.3d 629, 639 n. 10 (9th Cir.1998); *United States v.Wunsch*, 84 F.3d 1110, 1119 (9th Cir.1996)). Supreme Court authority also provides conflicting guidance. *Compare City of Chicago v. Morales*, 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality) ("When vagueness permeates the text of such a law, it is

claim is foreclosed by our precedent. *See United States v. X–Citement Video, Inc.*, 982 F.2d 1285, 1288 (9th Cir.1992) (holding that 18 U.S.C. § 2256 is not vague because it includes the terms "simulated" and "lascivious"), *overruled on other grounds by* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); *Wiegand,* 812 F.2d at 1243–44 (dismissing the argument that "lascivious" is an unconstitutionally vague term).

### IV

Congress acted within the bounds of its Commerce Clause power in criminalizing the intrastate possession of commercial child pornography. Adams's facial attack must fail. Commercial child pornography—unlike home-grown child pornography—is a good susceptible to market forces. Congress rationally sought to influence that market by criminalizing the possession of child pornography. Thus, as "part of a larger regulation of economic activity," *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624, 18 U.S.C. § 2252(a)(4)(B) is constitutional. The definition of "sexually explicit conduct" also passes constitutional muster as it is neither substantially overbroad nor void for vagueness.

**AFFIRMED.**

subject to facial attack."); *Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 59–60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (holding that in the First Amendment context, a challenger may bring a facial vagueness challenge to a statute even if its meaning is plain as applied to his or her own conduct if the vague statute's deterrent effect on speech is "real and substantial") (citation omitted); *NAACP v. Button,* 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (stating that a statute "may be invalid if it prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct"); *with Morales,* 527 U.S. at 73, 74, 119 S.Ct. 1849

(Scalia, J., dissenting) ("When a facial challenge is successful, the law in question is declared to be unenforceable in *all* its applications, and not just in its particular application to the party in suit."); *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").