# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2345

_____

| | | |
|---|---|---|
| Charlotte Klingler; Charles Wehner; Sheila Brashear, | * | |
| | * | |
| | * | |
| Appellees, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Director, Department of Revenue, State of Missouri, | * | |
| | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 12, 2004

Filed: May 3, 2004 (corrected 7/23/04)

_____

Before WOLLMAN, RICHARD S. ARNOLD, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

In Missouri, physically disabled people who pay a $2.00 annual fee to the state revenue department may obtain permanent removable windshield placards authorizing them to use reserved accessible parking spaces. The plaintiffs, a class of all who have purchased, or will purchase, such placards, sought a declaration that the charge of a fee for the placards violates Title II of the Americans With Disabilities

Act (ADA), *see* 42 U.S.C. §§ 12131-12165, an injunction against further collection of the placard fee by the Director of the Missouri Department of Revenue (Director), and monetary damages.  In an earlier appeal, *Klingler v. Director, Dep't of Revenue*, 281 F.3d 776, 777 (8th Cir. 2002) (per curiam), we affirmed a dismissal of the plaintiffs' claim for damages, but held that they could seek declaratory and injunctive relief against the Director under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), and remanded the case to the district court.

The district court, following cross-motions for summary judgment, granted the declaratory and injunctive relief sought, concluding that the fee charged to the plaintiffs violated the surcharge prohibition of 28 C.F.R. § 35.130(f), a regulation promulgated by the Department of Justice (DOJ) under the authority of the ADA, *see* 42 U.S.C. § 12134.  The Director appeals, arguing that her collection of the placard fee is not prohibited by the ADA and that, even if it were, such a prohibition would not be a constitutionally valid exercise of congressional power.  We review the district court's grant of summary judgment for the plaintiffs *de novo*, *see Tindle v. Caudell*, 56 F.3d 966, 969 (8th Cir. 1995), and reverse.

I.

Certain parking spaces in Missouri that are close to entrances of buildings are reserved for the exclusive use of physically disabled people.  *See* Mo. Rev. Stat. § 301.143.  Missouri law authorizes a motor vehicle containing a physically disabled occupant to park in one of these accessible parking spaces if the vehicle displays either a specially marked license plate, *see* Mo. Rev. Stat. § 301.142.3, or a removable windshield placard, *see* Mo. Rev. Stat. § 301.142.5.  A person parking a vehicle in a space reserved for disabled people who fails to display a disabled license plate or placard shall be fined, and the vehicle may be towed.  *See* Mo. Rev. Stat. § 301.143.4.  An application for a disabled license plate or windshield placard must be made to the Director and must be accompanied by a statement signed by a physician that certifies that the relevant person is "physically disabled" as defined by

Mo. Rev. Stat. § 301.142.1. *See* Mo. Rev. Stat. § 301.142.6. A disabled license plate may be obtained at no additional fee beyond that ordinarily charged for license plates, *see* Mo. Rev. Stat. § 301.142.4, but there is a fee of $2.00 per year charged for each windshield placard, *see* Mo. Rev. Stat. § 301.142.5.

The plaintiffs successfully argued below that Title II of the ADA and a regulation promulgated by the DOJ to enforce the ADA, *see* 28 C.F.R. § 35.130(f), prohibit the collection by the Director of the $2.00 annual fee for the placards. Title II of the ADA states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, ... be subjected to discrimination by [a public] entity." 42 U.S.C. § 12132. Congress directed the DOJ to promulgate regulations for the implementation of Title II of the ADA. *See* 42 U.S.C. § 12134(a). The regulation relied on by the plaintiffs and the district court is a specific application of the nondiscrimination mandate of Title II. The regulation expressly prohibits public entities from placing a "surcharge" on a disabled person or any group of disabled people "to cover the costs of measures ... that are required to provide [those individuals] with the nondiscriminatory treatment required by the [ADA]." 28 C.F.R. § 35.130(f).

To determine whether the fee involved in this case violates Title II, we would need to decide whether the measure for which Missouri levies the fee is "required to provide that individual or group ... nondiscriminatory treatment" as mandated by the ADA and, if so, whether the fee for the measure is a "surcharge." *See* 28 C.F.R. § 35.130(f); *Dare v. California*, 191 F.3d 1167, 1171 (9th Cir. 1999), *cert. denied*, 531 U.S. 1190 (2001). We realize that the Supreme Court has advised that "[w]here a case ... can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons." *Siler v. Louisville & N.R. Co.*, 213 U.S. 175, 193 (1909). But we believe that this is one of those rare occasions where the appropriate resolution of the constitutional issue is reasonably straightforward and determinate and the resolution

-3-

of the statutory issue is, by contrast, difficult and complex. *See, e.g., D'Almeida v. Stork Brabant B.V.*, 71 F.3d 50, 51 (1st Cir. 1995) (per curiam), *cert. denied*, 517 U.S. 1168 (1996). We thus proceed directly to the constitutional question, and conclude that the application of Title II to the present circumstances would not be a constitutionally valid exercise of congressional power.

II.

We have held that "the extension of Title II of the ADA to the states was not a proper exercise of Congress's power under Section 5 of the Fourteenth Amendment." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1010 (8th Cir. 1999) (en banc). The plaintiffs concede that, but they contend that Title II, as applied to the Director, is a constitutional exercise of Congress's Article I power to "regulate Commerce ... among the several States," U.S. Const., art. I, § 8, cl. 3.

The Supreme Court has held that Congress may regulate three broad categories of activity under its commerce power: "use of the channels of interstate commerce"; persons, things, and instrumentalities in interstate commerce; and intrastate "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). Because the disabled placard fee clearly does not fit within either of the first two *Lopez* categories, the relevant inquiry is whether Missouri's placard fee "substantially affects" interstate commerce.

The plaintiffs argue that Title II is a legitimate exercise of congressional power under the commerce clause. We think that the issue is more properly understood, though, not as whether the commerce clause gives Congress authority to enact Title II in the first place, but as whether the statute's application to the regulated activity in the case at hand is a valid one. *See United States v. Stewart*, 348 F.3d 1132, 1140-42 (9th Cir. 2003). As the Supreme Court stated in *Lopez*, 514 U.S. at 559, "the proper

test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce."

In *United States v. Morrison*, 529 U.S. 598 (2000), the Supreme Court provided guidance for determining whether a statute regulates intrastate activity that "substantially affects" interstate commerce. We must consider whether the regulated activity is commercial or economic in nature; whether the statute contains an "express jurisdictional element that might limit its reach to a discrete set" of cases; whether the statute or its legislative history contains "express congressional findings" regarding the effects of the regulated activity upon interstate commerce; and whether the link between the regulated activity and a substantial effect on interstate commerce is "attenuated." *Id.* at 609-13 (internal quotations omitted). We conclude that all four of the considerations identified in *Morrison* favor a finding that the application of Title II to the facts of this case would be unconstitutional under the commerce clause.

### A.

The first question that we ask in determining whether the regulated activity substantially affects interstate commerce is whether the regulated activity is commercial or economic in nature. The Supreme Court recognized in both *Lopez* and *Morrison* that the question whether an intrastate activity is commercial or noncommercial may generate "legal uncertainty." *Lopez*, 514 U.S. at 566, *quoted in Morrison*, 528 U.S. at 610. The Director's challenged activity does involve the collection of money, and can thus perhaps be classified as "economic" in a sense. But we agree with eight judges of an evenly-divided Fifth Circuit that "since what we are concerned with is the power of Congress ... 'to regulate Commerce ... among the several States' ... 'commercial' rather than simply any broadly understood concept of 'economic' seems to be the appropriate concept." *United States v. McFarland*, 311 F.3d 376, 396 (5th Cir. 2002) (en banc), *cert. denied*, 123 S. Ct. 1749 (2003). We do not see how the Director's activity of non-profit revenue collection for state

government can reasonably be deemed a "commercial" activity. The relevant question seems to be whether the regulated activity is commercial in the sense of being closely connected to some national commercial market, and the Director's collection of the placard fee for state services cannot fairly be so classified.

B.

We ask next whether the statute included an express jurisdictional element in order to limit its reach to a distinct set of activities that can be appropriately regulated under the commerce clause. "Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce." *Morrison*, 529 U.S. at 612. The absence of such a jurisdictional element, though, might indicate that a statute is overinclusive, unconstitutionally sweeping within its ambit activities that have no explicit connection with or effect on interstate commerce. Title II of the ADA includes no requirement of a case-by-case showing of a nexus between the regulated activity and interstate commerce.

C.

The next question is whether Congress made express findings about the effects of the proscribed activity on interstate commerce. In enacting the ADA, Congress expressly invoked the commerce clause power, stating: "It is the purpose of this chapter ... to invoke the sweep of congressional authority, including the power ... to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). Congress also stated in the ADA its "finding" that "the continuing existence of unfair and unnecessary discrimination and prejudice [against people with disabilities] ... costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." 42 U.S.C. § 12101(a)(9). The legislative history contains additional legislative findings regarding the effects of disability discrimination on the

economy. For instance, the report of the House Committee on Education and Labor concludes that disability discrimination creates unnecessary shortages in the labor pool while costing the government billions of dollars in unnecessary welfare programs. *See* H.R. Rep. No. 101-485 (II), at 43-47 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 325-29.

Even assuming that these findings identifying the effects of disability discrimination on interstate commerce are factually accurate, there were no findings that the type of parking placard fees being regulated here substantially affect interstate commerce. While express congressional findings are not required, such findings are helpful where a substantial effect on interstate commerce is not evident "to the naked eye." *Lopez*, 514 U.S. at 563. A substantial relation between Missouri's placard fee and interstate commerce is not obvious to us, and the findings describing the general economic effects of discrimination against disabled people do not lend much support to the conclusion that the exercise of congressional power to prohibit the Director's collection of the $2.00 annual placard fee is proper.

D.

The final question is whether the link between Missouri's $2.00 annual disabled placard fee and any substantial effect on interstate commerce is attenuated. In their brief, the plaintiffs attempt to justify the regulation of Missouri's placard fee under the commerce clause by arguing that Title II is "designed to eradicate barriers limiting the ability of persons with disabilities to engage in commerce," that "[e]nabling people to get into stores is at the core of Congress' power to regulate commerce," and that "[i]n regulating commerce, Congress may prohibit States from enacting fees and taxes which encumber commerce."

We agree that a person in Missouri whose mobility is impaired by a physical disability can engage in many economic transactions more flexibly and conveniently with a placard than without a placard. Unlike license plates that indicate disability (which disabled Missourians can obtain at no extra charge), windshield placards are portable and thus allow disabled people to use accessible parking spaces when riding with others, or when driving another person's car or a rental car. In a sense, then, the lack of a placard can be considered a "barrier" hampering the ability of disabled people to participate in interstate commerce. The question at issue, however, is not whether a complete absence of disabled placards would substantially affect interstate commerce, but whether the imposition of a $2.00 annual charge on each placard would substantially affect interstate commerce.

The plaintiffs analogize the prohibition of the $2.00 annual placard fee to the "similar efforts to integrate groups previously excluded from commerce" that were upheld by the Supreme Court under the commerce clause in *Heart of Atlanta Motel, Inc., v. United States*, 379 U.S. 241 (1964), and *Katzenbach v. McClung*, 379 U.S. 294 (1964). In *Heart of Atlanta*, the Supreme Court held that Title II of the Civil Rights Act of 1964, which, as relevant, bars racial discrimination by places of "public accommodation," *see* 42 U.S.C. § 2000a, was a constitutional exercise of congressional power under the commerce clause "as applied ... to a motel which concededly serves interstate travelers." *Heart of Atlanta*, 379 U.S. at 242, 247, 261. In *Katzenbach*, the Court held that the same statutory provision was a valid exercise of congressional power "as applied to a restaurant annually receiving about $70,000 worth of food which has moved in commerce." *Katzenbach*, 379 U.S. at 298, 304-05.

We think that the effect of Missouri's placard fee on interstate commerce is much more speculative and tenuous than that of the racial discrimination at issue in *Katzenbach* and *Heart of Atlanta*. The Supreme Court, in *Katzenbach* and *Heart of Atlanta*, validated under the commerce clause the prohibition of restaurants and

motels turning away willing customers because of their race. The discriminatory activities targeted in these two cases were blocking a great number of potential economic transactions that would have occurred but for the discrimination and undoubtedly had a substantial aggregate affect on interstate commerce. Even if the transactions prevented by the racial discrimination would have been largely shifted to other commercial outlets, interstate commerce would, in the aggregate, be substantially affected by all of these disrupted and shifted transactions.

Racially exclusive policies at restaurants and hotels presented an insuperable barrier blocking the ability of many people to complete economic transactions at those establishments. The nominal placard fee, in contrast, is unlikely to deter any significant number of people, who would obtain placards if they were free, from purchasing them and thus acquiring the enhanced ability to engage in economic transactions that the placards might afford. Even if the Director provided the placards free of charge, disabled people would have to expend time and effort in applying for them at the Missouri Department of Revenue and getting a doctor's note, which requirements the plaintiffs do not challenge here. Considering the significant benefits conferred by the placards, we are unable to conclude that the additional minimal burden of the $2.00 annual fee would reduce the number of placard-possessing disabled people to such an extent that interstate commerce would be substantially affected.

There is one way in which the Director's collection of the placard fee could be deemed to affect interstate commerce substantially. The Director collects a total of about $400,000 per year in revenue from the placard fees. Our "society is an elastic medium which transmits all tremors throughout its territory," *United States v. A.L.A. Schechter Poultry Corp.*, 76 F.2d 617, 624 (2d Cir. 1935) (Hand, J., concurring), and the money annually collected by the Director ($2.00 out of the pocket of each of thousands of disabled people) would have gone somewhere else in the economy had

-9-

the Director not collected it. One could reasonably presume that a sizeable portion of the money that the Director collected would, in the absence of the placard fee, have ended up flowing through the various channels of interstate commerce. This effect on interstate commerce, however, seems to be "so indirect and remote that to embrace [it], in view of our complex society, would effectually obliterate the distinction between what is national and what is local." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). The mere fact that $2.00 paid to a state government for a placard might otherwise have been spent in a manner that affected interstate commerce is too attenuated to justify the inference that the $2.00 fee itself "substantially affects" interstate commerce in a manner justifying federal regulation.

## III.

For the reasons stated, we reverse the district court's grant of the plaintiffs' motion for summary judgment, and its award of declaratory and injunctive relief, and we remand the case to the district court for entry of a judgment consistent with this opinion.

RICHARD S. ARNOLD, Circuit Judge, dissenting.

With respect, I disagree with the Court's conclusion that Congress lacks power under the Commerce Clause to prohibit Missouri's imposition of a $2.00 fee for disabled-parking placards. I also believe that the $2.00 fee imposed on disabled individuals seeking a disabled-parking placard is a surcharge that violates Title II and 28 C.F.R. § 35.130(f). Therefore, I would affirm the judgment of the District Court.

I believe the Court takes too narrow a view of what activity is being regulated by Title II. The Court states that "[t]he nominal placard fee . . . is unlikely to deter any significant number of people, who would obtain placards if they were free, from

purchasing them and thus acquiring the enhanced ability to engage in economic transactions that the placards might afford." <u>Ante</u>, at 8. By taking this narrow view, the Court concludes that the fee has no substantial impact on interstate commerce because only some small, unknown number of disabled individuals who cannot pay the fee, or will not pay the fee, are denied the opportunity to participate in economic transactions. Although the Court concedes that certain disabled individuals would be denied the opportunity to participate in certain aspects of interstate commerce because they would not otherwise have access to places where such activity occurs, the Court holds that the number of disabled individuals who would be denied access is so insignificant that it does not have the requisite "substantial impact" on interstate commerce.

Congress could not possibly make express findings about every situation to which the ADA might be extended, nor is it required to do so under the Commerce Clause. Congress did, however, express its intent that disabled individuals not be subjected to discriminatory treatment, and the Department of Justice, in exercising its delegated authority, promulgated § 35.130(f) to ensure that disabled individuals were not required to pay for their right to reasonably equivalent access. I believe that the Court overlooks the fact that those disabled individuals who pay the fee are being required to pay for their access to interstate commerce while non-disabled individuals are not.

It is an axiom cherished by many economists that, all other things being equal, an increase in the cost of a certain kind of activity will decrease the amount of that activity. As I read the Court's opinion, it does not deny the validity of that axiom in general. Rather, it concludes that the decrease in shopping, say, by disabled individuals is simply not substantial enough to justify Congress's exercise of power under the Commerce Clause. This approach seems to me wrong in two ways. First, the amount of the decrease in economic activity is treated as an ordinary fact to be

proved by a preponderance of the evidence by the party bearing the burden of proof, here the plaintiffs. I agree that the record is devoid of evidence quantifying the amount of commercial activity — say, sales — that will be delayed or eliminated by placing a charge on the disabled-parking placards. This analysis, however, in my view, mischaracterizes the kind of "fact" we deal with here. What is at stake is a question of "legislative fact," the kind of fact that is expressly or implicitly "found" by a legislative body when it enacts a law, rather than "judicial fact," the kind of fact that has to do with who did what and the effect that activity had on the parties to the case.

When dealing with legislative facts, I think, even in the absence of express findings, we owe it to Congress to assume the existence of any state of facts reasonably conceivable by the legislature at the time the statute was enacted. The view that a substantial amount of commercial activity would be affected by this charge is certainly not arbitrary or unreasonable. We should give Congress the benefit of the doubt. When the constitutionality of a statute is challenged and "the legislative judgment is drawn in question," judicial review "must be restricted to the issue whether any state of facts either known or which could reasonably be assumed" supports such statute. United States v. Carolene Prods. Co., 304 U.S. 144, 154 (1938). Furthermore, although express findings may at times aid courts in reviewing the connection between a statute or regulation and interstate commerce, "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." United States v. Lopez, 514 U.S. 549, 562 (1995).

There are cases upholding statutes and regulations that were adopted without express findings about their impact upon interstate commerce. For example, in Gibbs v. Babbitt, 214 F.3d 483 (4th Cir. 2000), the Fourth Circuit upheld a regulation prohibiting the taking of red wolves on private property promulgated under the

-12-

Endangered Species Act. Although the Court recognized that there were no formal findings with regard to the impact of the regulation on interstate commerce, the Court recognized that it must "take account of congressional judgment and the judgment of the agency designated to implement the statute." Gibbs, 214 F.3d at 493 n.3. As a second example, the Seventh Circuit recently held that 18 U.S.C. § 2252(a)(4)(B) (possession of child pornography) was a constitutionally permissible exercise of Congress's power under the Commerce Clause despite the lack of express congressional findings because "Congress could have rationally reasoned" that intrastate possession of child pornography affects the interstate market for child pornography. United States v. Angle, 234 F.3d 326, 337 (7th Cir. 2000). In this case, Congress rationally could have found that the number of individuals deterred by the $2.00 fee from engaging in interstate commerce was substantial. It is certainly not obvious to me that the amount of economic activity affected here is insignificant or de minimis.

Moreover, I find the Court's attempt to distinguish the racial-discrimination cases, Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964), and Katzenbach v. McClung, 379 U.S. 294 (1964), unconvincing. It is true that the effect on commerce considered in those two cases was more pronounced. That is, Congress was attempting to override an absolute prohibition against participation in a certain economic activity based on a prospective patron's race. Here, disabled individuals are not kept out of the store altogether; rather the state has made it more difficult for them to enter the store. The difference in the two situations, I think, is one of degree rather than kind. I do not believe that this difference justifies making a distinction for Commerce Clause purposes.

The State of Missouri has made it more costly for certain disabled individuals to gain convenient access to places of business where commercial activity affecting interstate commerce is taking place. Congress has prohibited such state action by

statute, and the prohibition has been made explicit by regulation.  Automobiles and department stores are the very stuff of interstate commerce.  For these reasons, I respectfully dissent.  I would affirm the judgment of the District Court.

_____