**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

  v.

ROBERT WILSON STEWART, JR.,
   *Defendant-Appellant.*

No. 02-10318

D.C. No.
CR-00-00698-ROS

OPINION

On Remand from the United States Supreme Court

Filed June 30, 2006

Before: Alex Kozinski and Thomas G. Nelson,
Circuit Judges, and Jane A. Restani,* Judge.

Opinion by Judge Kozinski

 *The Honorable Jane A. Restani, Chief Judge, United States Court of
International Trade, sitting by designation.

**COUNSEL**

Thomas E. Haney, Phoenix, Arizona, for the defendant-appellant.

Paul K. Charlton, United States Attorney; John Joseph Tuchi, Deputy Appellate Chief; Joan G. Ruffennach, Assistant United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

James E. Leuenberger, Lake Oswego, Oregon, for amicus curiae Oregon Firearms Educational Foundation.

Sharon L. Browne, Arthur B. Mark, III, Sacramento, California, for amicus curiae Pacific Legal Foundation.

---

## OPINION

KOZINSKI, Circuit Judge:

We consider in light of *Gonzales* v. *Raich*, 125 S. Ct. 2195 (2005), whether Congress can use its commerce power to ban possession of homemade machineguns.

### Facts[1]

Robert W. Stewart sold parts kits for the manufacture and assembly of Maadi-Griffin .50 caliber rifles; he advertised the kits on the Internet and in *Shotgun News*, a national firearms magazine. Stewart believed the kits were legal to sell because the receivers on the rifles had not yet been completely machined and the rifles were thus not usable as firearms. An agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) discovered that Stewart had a prior conviction for possession and transfer of a machinegun and decided to investigate Stewart's business. Another agent, acting undercover, purchased one of Stewart's kits and determined that it could be "readily . . . converted" into an unlawful firearm, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 921(a)

---

[1]We restate the facts of this case from our prior opinion, *United States* v. *Stewart*, 348 F.3d 1132 (9th Cir. 2003).

(3)(A). Based on this information, the ATF agent secured a federal search warrant for Stewart's residence.

In addition to numerous rifle kits, the ATF search also turned up thirty-one firearms, including five machineguns. The machineguns had been machined and assembled by Stewart. Stewart was charged and convicted of one count of felony possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and five counts of unlawful possession of a machinegun in violation of 18 U.S.C. § 922(o). No charges were brought against Stewart regarding the advertised parts kits that were initially the subject of the investigation. Stewart appeals his conviction for unlawful possession of machineguns, claiming that 18 U.S.C. § 922(o) is an invalid exercise of Congress's commerce power and violates the Second Amendment; he appeals his conviction for possession of a firearm by a felon on Second Amendment grounds.[2]

In a prior opinion, we held, over Judge Restani's dissent, that as applied to Stewart, section 922(o) was an invalid exer-

---

[2]Stewart also claims the district court abused its discretion by denying his request for an evidentiary hearing on his motion to suppress. Defendant is entitled to an evidentiary hearing if he makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks* v. *Delaware*, 438 U.S. 154, 155-56 (1978). Stewart asserts that the ATF agent's affidavit never said how much time was required to convert Stewart's parts kit into a firearm and gave the false impression that the agent had fully converted the kit; thus, Stewart claims, the affidavit could not support a finding of probable cause that the parts kits could "readily be converted," as defined in 18 U.S.C. § 921(a)(3)(A). The district court, in a carefully reasoned opinion, held that Stewart failed to meet his burden; even if the allegedly false and misleading statements were redacted from the affidavit, and the alleged omissions were added to it, the district court found that the affidavit, which contained Stewart's own statements about how easily his kits could be converted, still supported a finding of probable cause. We cannot see, and Stewart offers hardly any explanation, how the district court's reasoned opinion was an abuse of its discretion.

cise of Congress's commerce power. *See United States* v. *Stewart*, 348 F.3d 1132, 1140 (9th Cir. 2003). After its decision in *Raich*, the Supreme Court granted certiorari, vacated our decision and remanded. *See United States* v. *Stewart*, 125 S. Ct. 2899 (2005) (mem.).

## Analysis

**[1] 1.** Section 922(o) makes it illegal to "transfer or possess a machinegun."[3] As we recognized in our prior opinion, there is nothing inherently economic or commercial about mere possession of an object, so we must consider whether criminalization of machinegun possession falls within Congress's commerce power. *See* U.S. Const. art I., § 8. It is well-established that Congress can regulate three categories of economic activity under its commerce power: (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce" and (3) "those activities having a substantial relation to interstate commerce." *United States* v. *Lopez*, 514 U.S. 549, 558-59 (1995). We began our prior opinion by holding that section 922(o) could not be justified under either of the first two categories. *See Stewart*, 348 F.3d at 1134-36. So we turned to whether Stewart's possession of a homemade machinegun substantially affected interstate commerce. We applied the four-prong test articulated in *United States* v. *Morrison*, 529 U.S. 598 (2000):

> (1) whether the regulated activity is commercial or economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

---

[3]Or, at least most of them. Section 922(o), which took effect in 1986, does not affect possession and transfer of machineguns that were lawfully possessed before the statute went into effect. *See id.* § 922(o)(2)(B).

*Stewart*, 348 F.3d at 1136-37 (citing *Morrison*, 529 U.S. at 610-12). We held that section 922(o) failed the first prong because "[p]ossession of a machinegun is not, without more, economic in nature." *Id.* at 1137. We next determined that the effect of Stewart's activities on interstate commerce was quite attenuated: "Stewart's homemade machineguns did not stimulate a demand for anything illegal—all the components he bought were legally available from commercial sources." *Id.* at 1138. And his possession did not affect overall demand because there was no evidence that "Stewart would ever have bought a machinegun from a commercial source, had he been precluded by law from building one himself." *Id.* We then noted that section 922(o) contains no "jurisdictional element anchoring the prohibited activity to interstate commerce." *Id.* And finally, we noted that "Congress also failed to make any legislative findings when it enacted the statute" that might have explained and justified Congress's policy choices. *Id.* We held that legislative findings supporting prior firearms legislation were not instructive in our evaluation of section 922(o) because the section represented a sharp break from prior legislation in the field. *Id.* at 1139. Whereas earlier statutes criminalized transactions, sales or deliveries of firearms —quintessential economic activities—section 922(o) criminalizes mere possession. Because, as applied to Stewart, section 922(o) failed all four prongs of the *Morrison* test, we held that it was unconstitutional.

**[2] 2.** We now turn to whether our prior analysis is consistent with the approach to applied Commerce Clause challenges articulated in *Raich*. There, the Court considered whether the Controlled Substances Act ("CSA") could constitutionally be applied to the possession of marijuana authorized by a physician's prescription dispensed in accordance with state law. The claims and the statute at issue in *Raich* were nearly identical to those at issue here:[4] Like Raich,

---

[4]Except, of course, for one difference that is quite important to Stewart: Whereas Raich sought declaratory and injunctive relief, *see Raich*, 125 S. Ct. at 2200, Stewart challenges a successful government prosecution.

Stewart makes an as-applied challenge; he does not contend that the statute under which he was convicted falls entirely outside Congress's commerce power, as did the defendants in *Morrison* and *Lopez. See Raich*, 125 S. Ct. at 2209. And like Raich, Stewart claims his possession falls within a subgroup of purely intrastate activities that can easily be cordoned off from those Congress may constitutionally control. The contested statutes themselves are nearly identical as well. Both the CSA and section 922(o) criminalize possession—an activity that, under the *Morrison* framework, seems entirely non-economic. Neither contains an express jurisdictional element to limit its reach, nor any express congressional findings that intrastate possession will affect interstate commerce.[5]

The Supreme Court systematically rejected each of Raich's claims. It began by reiterating its prior holding that Congress may "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Raich*, 125 S. Ct. at 2205. Therefore, "when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.' " *Raich*, 125 S. Ct. at 2206 (quoting *Lopez*, 514 U.S. at 558); *see also id.* at 2209 ("That the regulation ensnares some purely intrastate activity is of no moment.").

[3] The Court then held Raich's arguments were squarely

---

[5]After *Raich*, the Supreme Court also vacated the Eleventh Circuit's opinion in *United States* v. *Maxwell*, 386 F.3d 1042 (11th Cir. 2004), which struck down the application of the Child Pornography Prevention Act of 1996 to the intrastate possession of child pornography produced within the state. *See id.* at 1045; *United States* v. *Maxwell*, 126 S. Ct. 321 (2005) (mem.). In affirming the conviction on remand, the Eleventh Circuit stated "much of the Court's analysis could serve as an opinion in this case by simply replacing marijuana and the CSA with child pornography and the CPPA." *United States* v. *Maxwell*, 446 F.3d 1210, 1216 (11th Cir. 2006). Well put. We might as easily say "machineguns and section 922(o)."

controlled by *Wickard* v. *Filburn*, 317 U.S. 111 (1942): "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market . . . ." *Raich*, 125 S. Ct. at 2206. Applying *Wickard*, the Court rejected Raich's attempt to carve out a narrow class of intrastate activities as beyond the reach of the Commere Clause. Raich claimed that when evaluating her activities under *Wickard*, the Court should look only at the effect of homegrown marijuana authorized by state law. However, the Court refused to do so; after explaining that homegrown marijuana—authorized under state law or not—could quite easily leak into the interstate market, the Court held that "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions." *Id.* at 2207; *see id.* at 2209 ("Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."). Absent was any analysis of whether state-authorized marijuana differed from other homegrown marijuana. Therefore, the fact that Raich did not herself affect interstate commerce was of no moment; when Congress makes an interstate omelet, it is entitled to break a few intrastate eggs. *Id.* at 2206.

[4] The lack of specific congressional findings regarding the effect of homegrown marijuana on interstate activity didn't change the Court's view: "[W]e have never required Congress make particularized findings in order to legislate, absent a special concern such as the protection of free speech."[6] *Id.* at 2208 (internal citations omitted). And the Court made clear that courts are not to scrutinize Congress's conclusions

[6]We note in passing that since the Second Amendment does not grant individual rights, *see Silveira* v. *Lockyer*, 312 F.3d 1052 (9th Cir. 2002), we cannot rely on it as a basis for requiring Congress to make specific findings in legislation touching on firearms.

closely. "We need not determine whether [Raich's] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."[7] *Id.*

Contrasting the Controlled Substances Act with the statutes at issue in *Lopez* and *Morrison*, the Court noted that the CSA "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." *Id.* at 2211. And "[p]rohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Id.* Therefore, "[g]iven the findings in the CSA and the undisputed magnitude of the commercial market for marijuana, . . . *Wickard* v. *Filburn* and the later cases endorsing its reasoning foreclose" "the claim that a locally cultivated product that is used domestically rather than sold on the open market is not subject to federal regulation." *Id.* at 2215.

**3.** Notwithstanding the numerous similarities between this case and *Raich*, *see* p. 7269-70 *supra*, Stewart claims that *Raich* should be distinguished. Stewart's first argument is that, under the framework articulated in *Raich*, this case should be governed by *Lopez* and *Morrison*. In *Raich*, the Court distinguished *Lopez* as concerning "a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." *Id.* at 2209. The Court noted that the statute was not an "essential part[ ] of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at

---

[7]Though the Court didn't say so explicitly, we read its use of the term "rational basis" as incorporating the rational basis test that we employ in run-of-the-mill equal protection cases—those not involving fundamental rights or discrete and insular minorities. *See, e.g.*, *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-88 (1955); *see also United States* v. *Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

2210 (quoting *Lopez*, 514 U.S. at 561). Similarly, *Morrison* was distinguished as merely granting "a federal civil remedy for the victims of gender-motivated crimes." *Id.* at 2210. The Court found that "[t]he statutory scheme [at issue in *Raich*] is at the opposite end of the regulatory spectrum." *Id.* The CSA is "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances.' " *Id.*

**[5]** In our earlier opinion, we concluded that section 922(o) was quite similar to the statute at issue in *Lopez*. *See Stewart*, 348 F.3d at 1139. But *Raich* forces us to reconsider. Like the possession regulation in the Controlled Substances Act, the machinegun possession ban fits within a larger scheme for the regulation of interstate commerce in firearms. Guns, like drugs, are regulated by a detailed and comprehensive statutory regime designed to protect individual firearm ownership while supporting "Federal, State and local law enforcement officials in their fight against crime and violence." Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213. Just as the CSA classifies substances in five different categories, placing different controls on each class based on a combination of its legitimate uses, potential for abuse and effects on the body, the federal firearms statutory regime classifies weapons for differential treatment as well: Some firearms are freely transferrable, others must be registered and, still others (like machineguns) are largely banned.

**[6]** Nevertheless, there is one major difference between the possession ban in the CSA and section 922(o): The machinegun ban was enacted almost twenty years after the statute establishing the current federal firearms regulatory regime. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(9), 100 Stat. 449, 452-53 (1986) (codified at 18 U.S.C. § 922(o)). Nevertheless, we don't read *Raich* as requiring us to consider section 922(o) as stand alone legislation like that in *Morrison* and *Lopez*. *Raich* stands for the proposition that Congress can ban possession of an object where it

has a rational basis for concluding that object might bleed into the interstate market and affect supply and demand, especially in an area where Congress regulates comprehensively. Neither the Gun-Free School Zones Act of 1990 nor the Violence Against Women Act of 1994 could be defended as plugging a hole in otherwise comprehensive regulation. Whether guns could be possessed in school zones was highly unlikely to affect the supply and demand for guns in the national market. And the Violence Against Women Act was at best tenuously related to interstate commerce. But section 922(o), like the marijuana possession ban in the CSA, is different—Congress could have rationally concluded that homemade machineguns would affect the national market. That Congress took a wait-and-see approach when it created the regime doesn't matter. The Commerce Clause does not prevent Congress from correcting deficiencies in its regulatory scheme in piecemeal fashion. To conclude otherwise would eliminate Congress's ability to regulate with a light touch in the first instance and tinker at the margins in light of experience. *Raich*'s deferential review of comprehensive federal regulatory schemes ensures that Congress retains as much discretion to adjust the details of its regulatory scheme as it had when it created the regime. Therefore, the fact that section 922(o) was passed long after the Gun Control Act is not of constitutional significance.

Stewart makes a few more claims, none of which have merit. He points out that the machineguns *he* possessed never traveled in interstate commerce; only some of their components had. This fact, while true, is entirely irrelevant. Neither the fully mature homegrown marijuana at issue in *Raich* nor the harvested wheat at issue in *Wickard* had ever crossed state lines either. Nor does it matter that Stewart's activities alone did not have a substantial effect on interstate commerce. Since *Wickard*, it has been well established that we aggregate intrastate activities in as-applied Commerce Clause challenges. After *Raich*, the proper focus in that inquiry is not Stewart and his unique homemade machineguns, but all homemade

machineguns manufactured intrastate. Moreover, we do not require the government to prove that those activities *actually* affected interstate commerce; we merely inquire whether Congress had a rational basis for so concluding.

We have no doubt that it did. The market for machineguns is established and lucrative, like the market for marijuana. "[T]here is a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession is essential to effective control of the interstate incidents of such traffic." *United States* v. *Rambo*, 74 F.3d 948, 952 (9th Cir. 1996) (alteration in original) (quoting *United States* v. *Kirk*, 70 F.3d 791, 797 (5th Cir. 1995)); *see also United States* v. *Wilks*, 58 F.3d 1518, 1521 (10th Cir. 1995) ("[M]achineguns . . . by their nature are 'a commodity . . . transferred across state lines for profit by business entities.' " (second omission in original) (quoting *United States* v. *Hunter*, 843 F. Supp. 235, 249 (E.D. Mich. 1994)); *id.* (describing the "extensive, intricate, and definitively *national* market for machineguns" (quoting *Hunter*, 843 F. Supp. at 249)).

It doesn't matter, as the amici would have us believe, that the machineguns Stewart manufactured were unique. *See Stewart*, 348 F.3d at 1135 (quoting the ATF Firearms Technology Branch as saying that one of Stewart's machineguns was "*a unique type of firearm*" (emphasis in original)). One of the amici argues that "[b]ecause Mr. Stewart's gun is unique, homemade, and hand-tooled, it does not 'overhang' the market, and threaten to enter the market, and affect prices and demand in the same way as wheat or marijuana." But at some level, everything is unique; fungibility is a matter of degree. One of the motivating concerns underlying the blanket prohibition on possession of marijuana under the CSA is that those in a state of drug-induced euphoria care not a whit whether their marijuana has ever crossed state borders. Similarly, those seeking machineguns care only whether the guns work effectively—whether they discharge large amounts of ammunition with a single trigger pull. To the

extent that homemade machineguns function like commercial machineguns, it doesn't matter whether they do so in a unique way; as economic substitutes, they are interchangeable.

**[7]** We therefore hold that Congress had a rational basis for concluding that in the aggregate, possession of homemade machineguns could substantially affect interstate commerce in machineguns. Homemade guns, even those with a unique design, can enter the interstate market and affect supply and demand. Having reached that conclusion, we need not inquire into the specifics of Stewart's possession: "[W]hen 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.' " *Raich*, 125 S. Ct. at 2206 (quoting *Lopez*, 514 U.S. at 558). Section 922(o) can constitutionally be applied to Stewart's possession of homemade machineguns.

**[8] 4.** Stewart also contends that the Second Amendment guarantees him the right to possess machineguns, as well as the right to possess firearms generally despite his prior felony conviction. We previously held that this claim is squarely precluded by *Silveira* v. *Lockyer*, 312 F.3d 1052 (9th Cir. 2002), and *Raich* did nothing to change that. *See Stewart*, 348 F.3d at 1142 (quoting *Silveira*, 312 F.3d at 1087).

**AFFIRMED.**