**UNITED STATES of America,**
**Plaintiff,**

v.

**Chad C. ROTHACHER, Defendant.**

**No. 06–05–BU–DWM.**

United States District Court,
D. Montana.
Butte Division.

July 18, 2006.

See also 901 P.2d 82.

Paulette L. Stewart, Office of the U.S. Attorney General, Helena, MT, for Plaintiff.

**ORDER**

MOLLOY, Chief Judge.

**I. Introduction and Factual Background**

In February 1994, the Flathead County District Court convicted Rothacher of mitigated deliberate homicide. Rothacher had been involved in a bar fight that spilled out the back of the bar where the decedent fell and hit his head on the ice and then suffered a kick to the head from Rothacher before dying due to brain trauma. Rothacher appealed the district court conviction to the Montana Supreme Court, which affirmed the district court and issued a notable opinion concerning a defendant's mental state and intended harm. *See State v. Rothacher,* 272 Mont. 303, 901 P.2d 82 (1995).

Rothacher was sentenced by the state trial court to a term of 16 years with 10

years suspended. In July 1995, Rothacher was paroled from the Montana State Prison and he commenced serving his 10–year suspended sentence. Ten years later, in May 2005, the same state district court revoked his suspended sentence after discovering that he possessed 12 firearms, violating the terms of his probation. After full consideration of all the facts and circumstances of the violation the state court once again exercised the Montana State power and imposed an appropriate state sentence. Rothacher is currently under supervised parole, serving a seven-year sentence. Except for his firearms violation, all evidence indicates Rothacher fully complied with the terms of his probation and was successfully running a construction business in Gallatin County.

When Montana's U.S. Attorney got wind of the May 2005 proceedings in state district court, the Grand Jury indicted Rothacher federally, charging him as a felon in possession of firearms in violation of 18 U.S.C. § 922(g) even though the state had seemingly dealt with the enormity of the crime. Rothacher's first federal indictment heralded a lengthy and convoluted pretrial process that included a Petite letter, the United States' failure to respond to Rothacher's motions to dismiss, a voluntary dismissal of the case, and a dilatory prosecutorial effort. The explanation justifying the federal prosecution is tied to allegations about Rothacher being dangerous—yet not so dangerous that an on again off again prosecution was pursued.

After voluntarily dismissing the case, the United States once again indicted Rothacher on April 21, 2006. The trial is currently set for July 24, 2006. Were the decision mine to make on first impression, I would dismiss the case because it is hard to make the Interstate Commerce Clause nexus in a principled way, particularly in light of Rothacher's Tenth Amendment arguments. But, I cannot find a reasoned and principled way to avert the holdings in *United States v. Stewart*, 451 F.3d 1071 (9th Cir.2006); *Gonzales v. Raich*, 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005); and the Phoenix-like resurrection of *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

## II. Analysis

### A. Recent Interpretations of the Commerce Clause

Article I, § 8 of the Constitution sets forth specific congressional powers, including "The Congress shall have the power ... [t]o regulate Commerce with foreign Nations, and among the several States...." Of the 18 clauses empowering Congress in this section of the Constitution, none is more important than the Commerce Clause. Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 3.3.1, 238 (Aspen L. & Bus.2002). In fact, the Framers included the Commerce Clause as a response to the inadequacies of the Articles of Confederation to empower the federal government to regulate commerce. *Raich*, 125 S.Ct. at 2205.

Beginning with the 1819 *M'Culloch v. Maryland* decision, the United States Supreme Court's interpretation of the Commerce Clause enabled the Congress to broadly regulate commerce. 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1819). Later in the Eighteenth Century the Court gradually adopted a more conservative view of the Clause through a constriction of the definitions of "commerce" and "among the states" and a renewed belief in the strength of the Tenth Amendment. Chemerinsky, *Constitutional Law: Principles and Policies* at § 3.3.3, 244–50. In 1937, however, the Supreme Court abruptly changed course when it used the Commerce Clause to uphold a state minimum

wage law for women and a federal labor relations law.[1]  *Id.* at § 3.3.4, 252.

Congressional power under the Commerce Clause remained unfettered from 1937 until 1995.  In 1995, the Court issued the first of four opinions reevaluating the use of the Commerce Clause as an instrument that broadly enabled Congress to regulate life in America.

### 1. The Court Reigns in the Commerce Clause in Three Successive Decisions.

The Supreme Court's 1995 *United States v. Lopez* decision marked a considerable departure from the Court's previous treatment of the Commerce Clause.  514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).  The Court reinforced this conviction when it followed *Lopez* with the *United States v. Morrison* decision in May 2000, followed a week later by *Jones v. United States*.  529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000);  529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000).

Each of these decisions conveyed the Court's belief that there were limits to the exercise of federal power through the Commerce Clause.  In *Lopez*, Chief Justice Rehnquist, writing for the Court in a five to four decision, held that the Gun–Free School Zones Act exceeded Congress' Commerce Clause authority.  514 U.S. at 569, 115 S.Ct. 1624.  The case affirmed a Fifth Circuit decision to dismiss a conviction under 18 U.S.C. § 922(q), which criminalized the possession of a firearm within 1000 feet of a school.  *Id.* at 553, 115 S.Ct. 1624.  Chief Justice Rehnquist found § 922(q) was not a regulation that fell within the three categories of activity that enable federal commerce regulation:  1) the channels of interstate commerce;  2) the instrumentalities of commerce power;  and 3) those activities having a substantial relation to interstate commerce.  *Id.* at 559, 115 S.Ct. 1624.  His analysis focused on the last category.

Chief Justice Rehnquist noted the Court had previously approved commerce laws governing intrastate activities that affected interstate commerce.  *Id.* at 559–60, 115 S.Ct. 1624, *see Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *Heart of Atlanta, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).  But contrary to the prior decisions and their affect on commerce, Rehnquist found that § 922(q) was a criminal statute "that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."  *Id.* He described this nexus as attenuated.  *Id.* at 563–67, 115 S.Ct. 1624.  Moreover, he noted there was not a jurisdictional element contained within the statute.[2]  *Id.* at 562, 115 S.Ct. 1624.

The decision also contemplated the significance of congressional findings and found, while particularized findings were not essential to legislate, there were no express congressional findings to guide the Court in its analysis.  *Id.* at 563–64.  The *Lopez* court found that to approve the statute as valid under the Commerce

---

**1.**  Justice Owen Roberts changed his stance on these issues, casting the decisive fifth vote in both cases.  This conversion headed off President Franklin D. Roosevelt's court-packing plan and became known as "the switch in time that saved nine."  *Id.*

**2.**  Rehnquist contrasted this to the Court's decision in *United States v. Bass,* 404 U.S. 336,

92 S.Ct. 515, 30 L.Ed.2d 488 (1971).  While the *Bass* Court set aside a conviction under the felon in possession statute, Rehnquist expressed confidence in the propriety of the law in place at the time, 18 U.S.C. § 1202(a), because it contained an express jurisdictional element.  *Id.*

Clause, the Court would have to "pile inference upon inference" in an effort to allow Congress the type of police power retained by the States. *Id.* at 569.

In *Morrison*, Chief Justice Rehnquist, in another five to four split, once again delivered the majority opinion striking down Congress' authority to enact a civil remedy under the Violence Against Women Act, where the statute exceeded the scope of congressional commerce power. 529 U.S. at 617, 120 S.Ct. 1740. Rehnquist used the *Lopez* framework to analyze the issue as a question of whether the regulation of the particular activity substantially affected interstate commerce. *Id.* at 609, 115 S.Ct. 1624.

As with *Lopez*, the statute did not contain a jurisdictional element. *Id.* at 613, 115 S.Ct. 1624. Rehnquist noted, however, there were significant congressional findings regarding the serious nature of gender-motivated violence. *Id.* at 614, 115 S.Ct. 1624. Nonetheless, the Court rejected the Congress's application of the Commerce Clause to "noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617–18, 115 S.Ct. 1624. He further stated, "[t]he Constitution requires a distinction between what is truly national and what is truly local." *Id.* The Chief Justice then noted Justice Thomas' point from his concurring opinion in *Lopez*, " '[t]he Constitution withhold[s] from Congress a plenary police power.' " *Id.* (citing *Lopez*, 514 U.S. at 584–85, 115 S.Ct. 1624, (Thomas, J., concurring)).

In dissent, Justices Souter, Stevens, Breyer, and Ginsburg cited the extensive congressional findings as evidence of the aggregate effect of gender-based violence upon the economy. They argued this evidence constituted a substantial effect upon interstate commerce and the failure to reach this conclusion was a betrayal to *Wickard* and its progeny. *Id.* at 628–637, 120 S.Ct. 1740. The net result seemed to signal a shift in the Court's view of Congress' power to exercise control over local activities in the criminal/tort arena.

In its third case limiting federal commerce powers, the Supreme Court reversed the Seventh Circuit, finding that arson of an owner-occupied residence did not subject the crime to federal prosecution because the property was not "used in" commerce. *Jones*, 529 U.S. at 850–51, 120 S.Ct. 1904. In the unanimous decision, Justice Ginsburg noted the statute required that the building be " 'used in an activity affecting commerce.' " *Id.* at 855, 120 S.Ct. 1904. She dismissed the federal arson statute as too broad because to follow the Government's logic would submit every "building in the land" to the umbrella of the federal criminal domain. *Id.* at 856, 858, 120 S.Ct. 1904.

Collectively, *Lopez*, *Morrison*, and *Jones* appeared to provide a new line of Supreme Court jurisprudence addressing federal commerce power. Rothacher's argument under these three cases is powerful. But, the Court did not stop at *Jones*.

### 2. The Supreme Court Tacks Again: the *Raich* Decision.

The Court's 2005 *Raich* opinion, like the rising Phoenix, signaled a return to the jurisprudence set forth in *Wickard*. But Justice Stevens also explained the *Raich* opinion was not contrary to the principles of *Lopez*, *Morrison*, and *Jones*. The decision addressed whether a California state law-the Compassionate Use Act-allowing the medicinal use of marijuana, could be set aside through the Commerce Clause (under the Controlled Substances Act) when the drugs in question were produced and consumed locally. *Raich*, 125 S.Ct. at 2201. The Court ruled that Congress could regulate purely local activities where

they were part of an economic "class of activities" that substantially affected interstate commerce. *Id.* at 2208–09.

The Court relied heavily upon *Wickard's* treatment of the Agricultural Adjustment Act for its reasoning: "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever, its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." *Id.* at 2205–06 (quoting *Wickard,* 317 U.S. at 125, 63 S.Ct. 82) (internal quotations omitted). The Court reasoned that marijuana, as part of a $10.5 billion annual enterprise, was a fungible commodity similar to wheat. *Id.* at 2206, 2208.

Notably, Justice Stevens characterized the assessment of congressional authority as a "modest" task where the Court need only determine if the activities, viewed in aggregate, presented a "rational basis" for concluding (not actually finding) there was a substantial affect on interstate commerce. *Id.* Thus, the majority opinion stated it had no trouble finding a rational basis for Congress' regulation of the intrastate manufacture and possession of marijuana.[3] *Id.* at 2208–09.

As previously noted, Stevens' opinion took considerable care to debunk the dissent's argument that this ruling was not in compliance with recent Supreme Court case law. *Id.* at 2209–11.

The opinion also weighed the question of federalism. In defense of this expansive use of congressional power in contradiction of a state law, Justice Stevens cited prior Court edicts: "The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail. It is beyond peradventure that federal power over commerce is 'superior to that of the States to provide for the welfare of necessities of their inhabitants' however legitimate or dire those necessities may be." *Id.* at 2212–13 (citation omitted). Stevens further reasoned that Justice Thomas' narrow construction of the Commerce Clause as set forth in the dissent would "require Congress to cede its constitutional power to regulate commerce whenever a State opts to exercise its 'traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens.' " *Id.* at 2213, n. 38.

In response, Justice O'Connor, joined by Chief Justice Rehnquist and Justice Thomas, found the decision an example of "overreaching" authority that "stifles an express choice by some States." *Id.* at 2229. Justice O'Connor quoted James Madison in The Federalist No. 45 for an overview of federalism: "The powers delegated by the proposed constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite . . . . The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." *Id.* (internal quotations omitted).

Despite the dissent voiced in *Raich,* the decision embraces a broad application of federal regulatory commerce power and appears to be a shift back to the early held views of the commerce power that existed between 1937 and 1995.

**3.** Justice Stevens further held, "That the regulation ensnares some purely intrastate activity is of no moment. As we have done many times before, we refuse to excise individual components of that larger scheme." *Id.* Also of note, Justice Scalia wrote a concurring opinion but he relied on the Necessary and Proper Clause to find approval for Congress' action. *Id.* at 2216.

### B. Felon in Possession: Legislative Intent and Supreme Court Case Law.

The legislative history supporting federal regulation of felons in possession of a firearm statute is relatively brief because the law was an amendment to the Omnibus Crime Control and Safe Streets Act, added by voice vote on the floor of the Senate in 1968. *See generally,* Barbara H. Taylor, *Close Enough for Government Work: Proving Minimal Nexus in a Federal Firearms Conviction:* United States v. Corey, 56 Me. L.Rev. 187 (2004). As it existed at the time, § 1202(a) of Title VII,[4] was ushered in by Senator Russell Long of Louisiana in the wake of several assassinations that had crippled the nation. In support of his legislation, the first federal law of its kind, Senator Long reasoned, " '[i]t seems to me that this simply strikes at the possession of firearms by the wrong kind of people.' " *Scarborough v. United States,* 431 U.S. 563, 572, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977). After Senator Long's introduction of the amendment on the floor a brief debate ensued with the general consensus that it was a good measure, albeit poorly drafted. *Bass,* 404 U.S. at 344–45, 92 S.Ct. 515. The amendment, however, was unexpectedly submitted to a vote and it passed without modification. *Id.* As a consequence, the Supreme Court has repeatedly bemoaned the bereft legislative history.

Not unexpectedly, the Court has wrestled with the implications of this "poorly drafted" statute. In *Scarborough,* the authoritative case on the application of the Commerce Clause to the felon in posses-sion statute, the Court concluded that the Congress intended that the law require no more than a "minimal nexus that the firearm [had] been, at some point, in interstate commerce." *Scarborough,* 431 U.S. at 575, 97 S.Ct. 1963. This "minimal nexus" standard has been the test for almost thirty years and after *Raich,* appears to still be the standard. *See Stewart* 451 F.3d 1071, 2006 WL 1791153.

### C. The Commerce Clause and Rothacher.

Rothacher contends that recent Supreme Court cases have eroded *Scarborough's* minimal nexus test to the point that his prosecution is not a valid application of federal regulatory law.[5] While, Rothacher correctly cites to the recent Commerce Clause case law, the courts have been unwilling to accept or replace existing standards with nuanced principles. These nuances may one day become law, but currently the Supreme Court and the Ninth Circuit still broadly apply the Commerce Clause and continue to use the minimal nexus standard.

For instance, while *Jones* did reject the government's "farreaching" efforts to apply the arson law, as Rothacher argues, the *Raich* Court left no doubt that federal regulatory authority was abundant and could even regulate matters "that may not be regarded as commerce." And while the *Jones* Court did curb the exercise by Congress of Commerce Clause power, it did so because the building involved with that particular prosecution, a owner-occupied residence, did not satisfy the jurisdictional

---

4. Pub.L. No. 90–351, 82 Stat. 197 (1968).

5. Rothacher devotes part of his brief to making essentially what is an equity argument. And while the details of Rothacher's dual prosecution, especially the general federalization of criminal law has structural appeal, it is still premised on a concept outside the bounds of the *Ashcroft Memo* and its literal application in this Federal District. Namely, what is the federal interest in this prosecution other than one more statistic?

element of the statute. *Jones,* 529 U.S. at 854–56, 120 S.Ct. 1904.

Rothacher also overlooks dicta from *Lopez* where the Chief Justice contrasted the lack of a jurisdictional element in the Gun–Free School Zones Act with the jurisdictional nexus mandated in the earlier version of the felon-firearm statute. *Lopez,* 514 U.S at 560–61, 115 S.Ct. 1624. Chief Justice Rehnquist stated, "Unlike the statute in *Bass,* § 922(q) has no express jurisdictional element which might limit its reach to a discreet set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* This pre-*Raich* analysis implies that the Court that limited congressional power under the Commerce Clause in *Lopez,* accepted the validity of congressional regulation under the felon in possession law.

In any case, a recent Ninth Circuit case provides guidance for the application of Commerce Clause power based on the economic "nexus" of the gun industry to interstate commerce. In *United States v. Younger,* a post-*Jones* and pre-*Raich* opinion, the Ninth Circuit held that " 'a one-time past connection to interstate commerce is sufficient under § 922(g)(1).' " 398 F.3d 1179, 1193 (9th Cir.2005) (quoting *United States v. Beasley,* 346 F.3d 930, 936 (9th Cir.2003)). The *Younger* Court specifically endorsed the validity of the felon-firearm statute despite the decisions in *Lopez* and *Morrison.*[6] *Id.* Significantly, since the *Lopez* decision the Congress has amended the Gun–Free School Zones Act to include a jurisdictional element and the Ninth Circuit has ruled it is constitutional.

*See United States v. Dorsey,* 418 F.3d 1038 (9th Cir.2005).

Finally, the Ninth Circuit's June 30, 2006 decision in *Stewart* is persuasive. 451 F.3d 1071, 2006 WL 1791153. In *Stewart,* the Ninth Circuit considered an as-applied challenge to 18 U.S.C. § 922(*o*) as an invalid exercise of Congress' power under the Commerce Clause.[7] Frequently citing *Raich,* the Ninth Circuit stated that "when Congress makes an interstate omelet, it is entitled to break a few intrastate eggs." *Id.* Noting that the machine guns in question were machined and assembled by Stewart at home, the Court found that the machine gun possession ban fit "within a larger scheme for the regulation of interstate commerce in firearms." *Id.* The Court further stated that it was "entirely irrelevant" whether the guns traveled in interstate commerce. The *Stewart* Court held Congress had a rational basis to regulate the possession of machine guns as part of its decision to regulate the stream of commerce of firearms. *Id.*

These cases support the United States' legal application of the federal felon in possession statute. Whether this particular case is an exercise of appropriate prosecutorial judgment is a much simpler issue to resolve.

**D. The Tenth Amendment does not Overcome the Commerce Clause in this Instance.**

The Tenth Amendment does not shield Rothacher from the reach of the Commerce Clause. The facts here do suggest a greater State interest than the state issues in other cases: there is an underlying Montana criminal violation; Montana

---

**6.** The defendant had challenged the firearms-related counts under the Second Amendment and then challenged the model jury instructions regarding § 922(g)(1). *See also United States v. Jones,* 231 F.3d 508 (9th Cir.2000).

**7.** § 922(*o*) makes it illegal to "transfer or possess a machine gun."

state courts have sentenced Rothacher for the original crime and for the subsequent probation violation; and Rothacher's Montana constitutional rights are in jeopardy. Nonetheless, the Commerce Clause technically provides the authorization for the United States to prosecute Rothacher.

The Tenth Amendment states, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. This provision recognizes the constitutional principle of dual sovereignty, which guides our system of government.

Rothacher argues that because the Montana Constitution, under Article II, Section 28(2), provides for full restoration of all rights of convicts following service of a sentence, the federal action under the felon in possession statute will permanently deprive him of his fundamental constitutional rights. He further argues that *Gregory v. Ashcroft*, supports his position because the Supreme Court held that federal courts must be clear that the Congress intended to override state sovereignty. 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). He cites *Oregon v. Ashcroft* as well, asserting it further dictates that Montana's sovereignty cannot be violated under the dictates of federal interest. 368 F.3d 1118 (9th Cir.2004) (*aff'd sub nom Gonzales v. Oregon*, —— U.S. ——, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006)).

■ As a threshold matter, the United States questions whether Rothacher has standing to raise a Tenth Amendment claim. Because Rothacher's individual rights, guaranteed by the Montana Constitution, are in jeopardy and his challenge to § 922(g) would provide relief, he has standing.

Traditionally, courts have been reticent to grant standing to private individuals, rather than states or state parties, to raise questions under the Tenth Amendment. *See Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118, 144, 59 S.Ct. 366, 83 L.Ed. 543 (1939). This policy stems from the constitutional circumscriptions that limit judicial power to "Cases" or "Controversies." U.S. const. Art. III, § 2. However, as the Supreme Court stated in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, "[w]here a party champions his own rights and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met." 438 U.S. 59, 80–81, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

In *Duke*, the Supreme Court found standing for plaintiffs who filed suit concerning the construction of two nuclear power plants in South Carolina. *Id.* at 72–73, 98 S.Ct. 2620. The plaintiffs sought to declare the Price–Anderson Act unconstitutional because it would limit the liability incurred by the design and construction of the plants. The Court reasoned that standing was appropriate where the plaintiffs established that some of the putative injuries would be "immediate" and "fairly traceable" to the legal action they initiated. *Id.* at 74–77, 98 S.Ct. 2620. The Court concluded that this causal link satisfied any need for a nexus between injury and the asserted constitutional rights. *Id.*

Similar to *Duke*, Rothacher has not yet incurred injury but by this preventative action he is in pursuit of his constitutional rights as established under the Montana Constitution. It is not as attenuated as in *Duke* where the plaintiffs sought to prevent the construction of nuclear power plants by attacking the statutory liability

provisions that enabled the construction project. Thus, the legal action is directly traceable to Rothacher's injury.[8]

■ Even though Rothacher has standing to challenge the statute under the Tenth Amendment, his claim fails. In *Oregon*, the Ninth Circuit struck down an executive policy formulated by United States Attorney General Ashcroft, that was not authorized in any way by the Congress. The *Oregon* Court ruled there was no congressional intent for the intervention in state affairs. *Oregon*, 368 F.3d at 1125. That is not the case here where the question concerns a law approved by the Congress over thirty years ago. And, the law was intended to keep the "wrong people" from having guns.

Rothacher's reference to *Gregory* is not necessarily convincing either. In *Gregory*, the Supreme Court affirmed a Missouri law that mandated retirement for state court judges at the age of 70. The judges challenged the law under the Federal Age Discrimination in Employment Act. 501 U.S. 452–53, 111 S.Ct. 2395, 115 L.Ed.2d 410. In response Governor Ashcroft argued the Missouri Constitution established this qualification and it was protected by the Tenth Amendment. *Id.* at 465–66, 111 S.Ct. 2395. The Court agreed that the Tenth Amendment protected the Missouri law because Congress had not been "unmistakably clear" of its intent to preempt state law and disrupt the balance between the federal government and the States. *Id.* at 463–66, 111 S.Ct. 2395.

Two years later, the Court discussed this subject again in *New York v. United States*. There the Court weighed the competing interests of dual sovereignty: "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

This tenet from *New York* coupled with the holdings in *Raich* and recent Ninth Circuit decisions such as *Stewart*, compel the conclusion that Congress' power under the Commerce Clause is almost unlimited where the prohibited product has significant economic value such as with drugs or guns. Moreover, as Justice Stevens stated in *Raich*, the primacy of the Supremacy Clause is such that it authorizes congressional commerce power to override state law even when the State is "provid[ing] for the welfare of necessities of their inhabitants however legitimate or dire those necessities may be." Consequently, where it is an intrastate issue that invokes state constitutional provisions, the law allows Congress to use the Commerce Clause to trump the Tenth Amendment so long as the regulated activity has significant economic value.

**E. Rothacher's Rule 48 Motion.**

Rothacher's arguments for dismissal under Federal Rule of Criminal Procedure 48 are compelling but not persuasive. The Court and the Parties have discussed the procedural machinations and the implications of federalism at two separate hear-

---

8. The Seventh Circuit contemplated a similar issue when it found a former police officer (who had been convicted of misdemeanor battery of his spouse) did have individual standing to file a claim under the Tenth Amendment. The former officer challenged the constitutionality of a 1996 amendment to the Gun Control Act, § 922(g)(9), that prohibited people convicted of domestic abuse crimes from possessing firearms. The Court found the provision was a valid extension of constitutional commerce power. *See Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir.1999).

ings now. The Court has expressed its concerns regarding the dual prosecution of this crime, the infringement of Montana's State sovereignty, and the manner in which the United States Attorney's Office handled these proceedings. There is no need to belabor these points further.

## III. Conclusion

Accordingly, in accordance with this Court's July 14, 2006 Order, the Defendant's motion to dismiss is DENIED.